J. J. McANAW, Plaintiff in Error, v. M. E. MOORE,
Defendant in Error.

Kansas City Court of Appeals, May 13, 1912.

1. **PRINCIPAL AND AGENT: Liability of Agent.** Where an
agent fails to perform the duties pertaining to his employment
and his principal suffers loss, the agent is liable in damages.

2. ———: ———. When a loss results to a principal from his
agent's failure to pursue the instructions given him, a cause of
action arises in favor of the former.

Error to Clinton Circuit Court.—*Hon. Alonzo D.
Burnes*, Judge.

REVERSED AND REMANDED (*with directions*).

*John A. Clark* for plaintiff in error.

*Frank B. Klepper* for defendant in error.

JOHNSON, J.—This is a suit begun in a justice
court by a principal against his agent to recover the
amount of a loss sustained by the principal in con-
sequence of the alleged failure of the agent to perform
the duties pertaining to the employment. The ver-
dict and judgment in the circuit court where the cause
was tried on appeal were in favor of defendant and
plaintiff brought the case here by writ of error.

A corporation engaged in the business of manu-
facturing condensed milk had a factory at Cameron
which drew its daily supplies of milk from neighbor-
ing farmers. The company, becoming pecuniarily em-
barrassed, had fallen behind in paying for such sup-
plies and the farmers, unwilling to continue selling
milk to the concern on credit, held a meeting, at which
plaintiff was present at least part of the time, and
decided to appoint a committee of two members to rep-

resent the body in an investigation of the solvency of the company and in acting for all the farmers in making daily collections from the company for future supplies of milk. We infer from the evidence that the financial affairs of the company were conducted at its office in Kansas City and that an arrangement was made by which daily remittances were to be forwarded to Cameron to pay for the preceding day's supply. The committee appointed defendant as its representative to take personal charge of these collections and out of them to pay the respective farmers the amounts due them for milk they had furnished. Settlements were to be made by defendant with the farmers every ten days.

Plaintiff testified that he accepted this arrangement in a conversation he had with defendant after the farmers' meeting. He said: "Mr. Moore met me on the street in front of Mr. Cottey's store and told me they had arranged now for him to run it and that he would put the money daily in the bank and that he would pay me every ten days for the milk. Under that arrangement we hauled milk for, I think, about thirty-three days. The first twenty-four days Mr. Moore paid me for. The last nine days he did not."

Defendant denies this conversation but admits he acted as agent for plaintiff, collected money of the company to pay plaintiff and paid plaintiff the proceeds of such collections less a commission he charged for his services. He states he did this pursuant to his employment by the committee. In relation to the scope of his duties he testified: "Well, they selected me to look after it for them. I collected the money. The money was to come through the bank and I was to see that it was received every day. It came in good shape for quite awhile so I was able to pay the first fourteen days. Began the 22nd of June, I think it was, and paid up to July the 5th. I was able to make the checks for that time and also for ten days following.

But before the ten days was up they failed to send the money up from Kansas City and then I called on the two men—"

Mr. O'Donnell, one of the committee of two, who was introduced as a witness by defendant testified in part: "Mr. O'Donnell, after the discovery of the insolvency of the company, and the selection of Mr. Moore, this defendant, to take the management of the business and distribute the money for the milk to the patrons, do you know what his duties were at that time and what he did do with the proceeds of that milk? A. Mr. Moore was to be— Q. What was he appointed to do? A. Mr. Moore was to go to the condenser in the mornings and get the weights of the milk. The money was to be sent up from Kansas City and deposited in the Farmers Bank—

"Q. How often? A. Every day.

"Q. After the daily deposit what was Mr. Moore to do with it? A. Every ten days he was to check it out to the customers."

The testimony of Mr. Jones, the other member of the committee, in substance was the same as that of Mr. O'Donnell. He gave the following explanation of the action of defendant in allowing plaintiff to continue furnishing milk for nine days after the company quit paying.

"Q. I will ask you this question: Did Mr. Moore keep you advised as to the cash that was coming in? As to the conditions? . . . A. He did, yes, sir. Q. What did he tell you? A. He told us that he had collected up within one day . . . Collected up within one day and it would be a pretty good time to quit. He had the money collected up within one day.

"Q. And he thought you had better quit? A. Yes, sir.

"Q. What did you tell him? A. Told him we thought he had better go on a little bit longer. . . .

"Q. What did you tell Mr. Moore when he told you he thought you had better quit hauling? A. I told him I thought we had better go on a few days longer. Maybe they would send up some more money."

There is no dispute over the facts that plaintiff continued to deliver milk to the factory for nine days after the company ceased to make remittances to defendant, that in that time he delivered 4850 pounds for which he was to receive one dollar per hundred pounds, and that neither defendant nor the committee notified him that the company had ceased to keep its agreement.

Under the conceded facts of the case the court should have directed the jury to return a verdict for plaintiff. Disregarding plaintiffs testimony about the conversation he states he had with defendant and looking at the facts only from the viewpoint of defendant's evidence, it is perfectly apparent and cannot be gainsaid that the arrangement the farmers authorized the committee to make and carry out contemplated strictly cash and not credit sales of milk and in deciding, as they did, to extend credit to the company the committee and defendant exceeded the scope of their authority and acted entirely on their own responsibility. They had no right to sell plaintiff's milk on credit without plaintiff's knowledge and to suffer plaintiff to go on with his deliveries in the mistaken belief that defendant was being paid daily by the vendee.

An agent is bound to follow his contract of agency "and when a loss results to a principal from his agent's failure to pursue the instructions given him, a cause of action arises in favor of the former; for a principal is entitled to have the agency executed in his own way as the party whose interest is at stake." [Marshall v. Ferguson, 94 Mo. App. 175.] Defendant's own testimony shows he knew that plaintiff wanted his business kept on a strictly cash basis and

he had no authority to change his principal's plan without consulting him. The company was known by defendant to be insolvent and the risk he took should be his own and not that of his principal.

The judgment is reversed and the cause remanded with directions to enter judgment for plaintiff in accordance with the views expressed. All concur.